IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHAWN S. MCKENZIE,<br><br>Plaintiff,<br><br>vs.<br><br>POVERELLO CENTER, INC.,<br>BLACK KNIGHT SECURITY &<br>INVESTIGATIONS, LLC, CITY OF<br>MISSOULA, MISSOULA COUNTY,<br>MISSOULA COUNTY<br>COMMISSIONERS, MISSOULA<br>CITY COUNCIL, ANDREA DAVIS,<br>JILL BONNY, JOHN DOES 1-4; and<br>JANE DOES 1-10,<br><br>Defendants. | CV 25-97-M-KLD<br><br><br>ORDER |

Plaintiff Shawn McKenzie, who is proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983 alleging federal constitutional claims and pendent state constitutional claims arising out of the enforcement of a no firearms policy at a homeless shelter located in Missoula. This matter comes before the Court on several pending motions, including: (1) Missoula County and Missoula County Board of Commissioners' (collectively "County Defendants") motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 10); (2) the City of Missoula's Rule 12(b)(6) motion to dismiss (Doc. 17); (3) the Missoula City Council and Mayor Andrea Davis's Rule 12(b)(6)

1

motion to dismiss (Doc. 19); (4) Poverello Center and Jill Bonny's (collectively "Poverello Defendants") Rule 12(b)(6) motion to dismiss (Doc. 33); (5) McKenzie's motion to strike Black Knight Security & Investigations, LLC's affirmative defenses[1] (Doc. 54); (6) McKenzie's motion for partial summary judgment[2] (Doc. 56); (7) Black Knight's Rule 12(c) motion for judgment on the pleadings (Doc. 71); and (7) McKenzie's motion for leave to file an amended complaint (Doc. 73).

## I.    Background[3]

McKenzie is a former resident and volunteer at the Jackson Street Emergency Shelter (the "Shelter"), which is located on property owned by the City of Missoula and is operated by the Poverello Center. (Doc. 2 at 1-2). During McKenzie's stay at the Shelter, he was provided "with a permanent bed and free, lockable locker, creating a de facto home." (Doc. 2 at 3). The Poverello Center has "a categorical 'no firearms' policy" that is in place at the Shelter, and the City uses Black Knight to enforce it. (Doc. 2 at 3).

---

[1] The Court has stayed briefing on this motion pending a ruling on the motions to dismiss. (Docs. 69, 70).

[2] The Court has stayed briefing on this motion pending a rule on the motions to dismiss. (Docs. 69, 70).

[3] The following facts are taken from the Complaint (Doc. 2) and are assumed to be true for the limited purpose of resolving the pending motions to dismiss.

At some point before March 14, 2025, McKenzie took possession of a locked bag belonging to another resident at the Shelter, Jeff McCook. (Doc. 3 at 3). Because McCook was a heavy drinker, McKenzie assumed the bag contained alcohol. (Doc. 2 at 3). McKenzie did not open or inspect the bag, and did not know what it actually contained. (Doc. 2 at 3).

On March 14, 2025, a Poverello Center employee (John Doe 1) and two Black Knight employees (John Does 2-3) demanded a "warrantless search" of McKenzie's locker. (Doc. 2 at 3). McKenzie objected and invoked his Fourth Amendment right to be free from unreasonable search and seizure. (Doc. 2 at 3). After John Does 1-3 left, McKenzie returned McCook's bag. (Doc. 2 at 3). McKenzie then located John Does 2-3 and, "under duress, emptied his locker and bags and searched his bed area. No contraband was found." (Doc. 2 at 3). John Does 1-3 then issued McKenzie "a notice of permanent exclusion for suspicion of possessing a firearm, with no written notice, paperwork or hearing." (Doc. 2 at 3). A Poverello Center employee (Jane Doe 1) "reportedly" contacted one or more Poverello Center board members, "possibly including Jill Bonny," during the exclusion process. (Doc. 2 at 4). McKenzie asked another Poverello Center employee (John Doe 4) for written documentation and appeal guidance, but John Doe 4 refused and advised McKenzie that no appeal existed for firearm-based exclusions. (Doc. 2 at 3).

3

Later on March 14, 2025, a City of Missoula Police Officer (Jane Doe 2, referred to here as "Officer Doe") approached McKenzie while he was packing. (Doc. 2 at 4). Officer Doe ordered McKenzie "to keep his hands visible and out of his pockets because it made her nervous," and McKenzie "removed his jacket to calm her." (Doc. 2 at 4). Officer Doe then "seized [McKenzie's] wrist, escorted him to his bed," and allegedly "interrogated him without reasonable suspicion, accusing him of bringing a gun." (Doc. 2 at 4). McKenzie "invoked his right to remain silent" and "[a]t no point did [Officer Doe] conduct a pat-down or search." (Doc. 2 at 4). Officer Doe "persisted until [McKenzie] asked if he was free to leave," and once he "was released, the officer informed him she had a firearm in her possession but did not state where it came from or provide any further details." (Doc. 2 at 4). McKenzie "believes" the firearm Officer Doe had in her possession was McCook's. (Doc. 2 at 4). A police report of the incident indicates that McCook told Officer Doe that firearm belonged to McKenzie and that McKenzie had shown McCook the firearm on the morning of March 14, 2025. (Doc. 2 at 4). McKenzie disagrees with McCook's assertions. (Doc. 2 at 4).

On June 25, 2025, McKenzie filed this action alleging five claims for relief. (Doc. 2). First, he claims that the Poverello Center's no firearms policy violates the Second Amendment of the United States Constitution and Article II § 12 of the Montana Constitution (Count 1). Second, McKenzie alleges that his locker was

unlawfully searched and that he was unlawfully detained in violation of his right to be free from unreasonable search and seizure under the Fourth Amendment and Article II §§ 4, 11, and 17 of the Montana Constitution (Count 2). Third, McKenzie asserts he had a constitutionally protected property interest in his residency at the Shelter and he was deprived of that property interest without due process in violation of the Fourteenth Amendment and Article II §§ 10, 26 of the Montana Constitution (Count 3). Fourth, McKenzie alleges a claim for municipal liability under *Monell v. Dept. of Social Services*, 636 U.S. 659 (1978) (Count 4). Fifth, McKenzie alleges a class-of-one equal protection claim under the Fourteenth Amendment and Article II § 16 of the Montana Constitution (Count 5). (Doc. 2 at 4-5). McKenzie seeks declaratory relief stating that Defendants violated his constitutional rights, seeks to enjoin "any policy prohibiting lawfully possessed firearms in the Shelter," and requests compensatory and punitive damages. (Doc. 2 at 6).

## II.    Legal Standards

### A.    Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li*

*v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).

The Court evaluates Rule 12(b)(6) motions to dismiss in light of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." While "detailed factual allegations" are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations and citations omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is plausible on its face when the facts pled "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The claim need not be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556

6

U.S. at 678. Facts that are "merely consistent with" a defendant's liability fall short of this standard. *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679.

**B.      Rule 12(c) Motion for Judgment on the Pleadings**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim, which means that the same legal standard "applies to motions brought under either rule." *Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1062 n. 4 (9th Cir. 2011).

"A judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, [a] party is entitled to judgment as a matter of law." *Lyon v. Chase Bank USA, N.A.* 656 F.3d 877, 883 (9th Cir. 2011) (quoting *Dunlap v. Credit Prot. Ass'n, L.P.*, 419 F.3d 1011, 1012 n. 1 (9th Cir. 2005)). "Not only must the court accept all material allegations in the complaint as true, but the complaint must be construed, and all doubts resolved, in the light most favorable to the" nonmoving party. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th

Cir. 1988). As a result, a party is not entitled to judgment on the pleadings if the nonmoving party's answer raises issues of fact or affirmative defenses that, if proven, would defeat recovery. *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregation*, 887 F.2d 228, 230 (9th Cir. 1989)); *Tawfilis v. Allergan, Inc.*, 2016 WL 3919488, at *2 (C.D. Cal. May 31, 2016); *Pit River Tribe v. Bureau of Land Management*, 793 F.3d 1147, 1159 (9th Cir. 2015).

## C.    Extrinsic Evidence

As a general rule, a court may not consider materials outside the pleadings when evaluating a Rule 12(b)(6) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (Rule 12(b)(6)); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (Rule 12(c)). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Under the incorporation by reference doctrine, the court may consider a document referenced in the complaint if the document is central to the plaintiff's claim and no party questions the document's authenticity. *See Corinthian Colleges*, 655 F.3d at 999; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The court may take judicial notice of matters of public record. *Lee v.*

8

*City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

**D.    Pro se Standard**

In general, "pro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler,* 790 F.2d 1362, 1364 (9th Cir. 1986). This means that "[p]ro se litigants must follow the same rules of procedure that govern other litigants." *Eaton v. Montana Silversmiths*, 2025 WL 253274, at \*1 (D. Mont. Jan. 21, 2025) (quoting *King v. Atiyeh*, 814 F.2d 565, 576 (9th Cir. 1987)); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *American Association of Naturopathic Physicians v. Hayhurst,* 227 F.3d 1104, 1107-08 (9th Cir. 2000) (rejecting pro se defendant's argument that he was excused from complying with procedural rules because they were "not something a pro se defendant can be expected to know"). Nevertheless, where a plaintiff is proceeding pro se, the court has an obligation "to construe the pleadings liberally and to afford the [plaintiff] the benefit of any doubt." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012).

If a Rule 12(b)(6) motion to dismiss or Rule 12(c) motion for judgment on the pleadings is granted, claims may be dismissed with or without prejudice, and with or without leave to amend. A pro se plaintiff must be given leave to amend

unless it is "absolutely clear that the deficiencies of the complaint cannot be cured by amendment." *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007). If it is clear that the complaint's deficiencies cannot be cured by amendment, dismissal without leave to amend is appropriate. *See e.g. Chaset v. Fleer/Skybox Int'l.*, 300 F.3d 1083, 1088 (9th Cir. 2002); *Klamath-Lake Pharma. Ass'n v. Klamath Medical Servs. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983).

## III.   County Defendants' Motion to Dismiss

County Defendants argue that McKenzie fails to state a claim for municipal liability under § 1983. 42 U.S.C. § 1983 "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (internal quotation marks omitted). It is well-settled that "municipalities and other local governmental units" such as counties are "persons" within the meaning of § 1983 and can be sued for damages. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978). Likewise, a board of county commissioners with final municipal policymaking authority may be subject to suit under § 1983. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n. 12 (1986) (where county policy is set by the board of county commissioners, that body's decisions may provide a basis for county liability). However, a municipality cannot be held vicariously liable for the acts of its employees based on a respondeat superior

theory. *See Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).

Instead, to impose liability on a municipality under § 1983 the plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Brown*, 520 U.S. at 403 (citing *Monell*, 436 U.S. at 694, *Pembaur v. Cincinnati*, 475 U.S. 469, 480-81 (1986)). A plaintiff can establish a municipal policy or custom in one of three ways. *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). First, the plaintiff can show that the local government acted "pursuant to an expressly adopted official policy." *Gordon*, 6 F.4th at 973 (citation omitted). Second, a local government "may be held liable for a 'longstanding practice or custom,'" such as failure "to implement procedural safeguards to prevent constitutional violations" or failure "to train its employees adequately." *Gordon*, 6 F.4th at 973 (quoting *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) and *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir 2012)). Third, a local government may be held liable under § 1983 "when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Gordon*, 6 F.4th at 974 (quoting *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). The

11

plaintiff must additionally allege facts to support a reasonable inference that the execution of a policy, custom, or practice of the municipality was the "moving force" that resulted in a constitutional deprivation. *Monell*, 436 U.S. at 691-92.

Thus, to state a claim for municipal liability under § 1983, McKenzie must allege facts showing that "(1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

McKenzie has not adequately pled a factual basis for municipal liability against the County Defendants. McKenzie's constitutional claims arise out of the enforcement of a no firearms policy at the Shelter, which is located on property owned by the City of Missoula and is operated by the Poverello Center. McKenzie's primary factual allegations are that Poverello Center and Black Knight employees wrongfully searched his locker and bed area without a warrant, that the Poverello Center and Black Knight wrongfully excluded him from the Shelter without due process, and that Officer Doe wrongfully detained and interrogated him without reasonable suspicion. McKenzie refers to the County Defendants only briefly in his Complaint. Although he lists Missoula County and the "Missoula County Commission" along with the City of Missoula and the Missoula City

12

Council as "municipal entities sued under § 1983 for Monell liability," he does not mention either of the County Defendants in the Factual Background section of his Complaint. (Doc. 2 at 2, 3-4). McKenzie refers to the County Defendants for a second time in his *Monell* liability claim, which alleges: "Official policy: City and County contract, board directives, and Mayor's ratification evidence adoption." (Doc. 2 at 5). McKenzie does not support his vague and general allegation with any facts, and he does not identify any Missoula County contract or Board of County Commissioners "directives" that could possibly have been the moving force behind the alleged constitutional violations or otherwise provide a basis for municipal liability. Absent any factual allegations relating to the County Defendants, McKenzie fails to state a claim for municipal liability under *Monell*.

McKenzie brings suit against the Missoula County Board of Commissioners as an entity and does not name any individual commissioners as defendants. Even if the Court were to liberally construe McKenzie's Complaint as asserting individual capacity claims against individual commissioners, he fails to state a claim for relief. "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002); *see also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the

Constitution."). McKenzie does not allege any facts demonstrating that any individual commissioners personally participated in the alleged deprivation of his constitutional rights as required to maintain a claim under § 1983. Accordingly, the County Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim for relief is well taken.

**IV.    City of Missoula and Poverello Defendants' Rule 12(b)(6) Motions to Dismiss and Black Knight's Rule 12(c) Motion for Judgment on the Pleadings**

The City of Missoula argues the Complaint fails to state a claim for relief for several reasons: (1) McKenzie fails to plausibly plead that the Poverello Defendants and Black Knight engaged in state action; (2) McKenzie fails to plead sufficient facts that any Fourth Amendment violation occurred; (3) McKenzie fails to sufficiently plead that he was deprived of a constitutionally protected property interest under the Fourteenth Amendment's due process clause; (4) McKenzie fails to sufficiently plead a class-of-one equal protection claim under the Fourteenth Amendment; (5) even if McKenzie did sufficiently plead constitutional violations, he fails to plead sufficient facts to establish municipal liability against the City under § 1983; and (6) McKenzie's Montana constitutional claims are concomitant with his federal constitutional claims and fail for the same reasons. (Doc. 17 at 2).

Like the City, the Poverello Defendants and Black Knight also argue that, taking the factual allegations in the Complaint as true, they are not state actors and

therefore cannot be held liable under § 1983 for violating McKenzie's constitutional rights. Because the threshold question of state action is dispositive as to McKenzie's constitutional claims against the Poverello Defendants and Black Knight, and all but one of his constitutional claims against the City, the Court addresses the state action arguments raised in all three motions to dismiss and for judgment on the pleadings together, before turning to the remaining grounds for dismissal raised in the City's motion.

###    A.    State Action

To state a claim under § 1983, "a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990). Section 1983 provides "a remedy for civil rights violations by state actors, not private citizens or entities." *Ezra v. Leifer*, 2018 WL 4026975, at *9 (C.D. Cal. June 27, 2018) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)), *report and recommendation adopted*, 2018 WL 4026999 (C.D. Cal. Aug. 20, 2018). Only in "exceptional cases" will a private entity "be treated as a state actor for constitutional purposes[.]" *O'Handley v. Weber*, 62 F.4th 1145, 1155-56 (9th Cir. 2023).

The Poverello Defendants have submitted publicly available records from the Montana Secretary of State showing that the Poverello Center is managed as a

15

private nonprofit entity.[4] (Doc. 34-1). Black Knight has likewise submitted publicly available records from the Montana Secretary of State showing that it is a private domestic limited liability company. (Doc. 72 at 14).[5] Because the Poverello Center and Black Knight are private entities, they and their executives and employees cannot be held liable under § 1983 unless this is "one of the exceptional cases in which a private entity will be treated as a state actor." *O'Handley*, 62 F.4th at 1155.

To determine whether a private entity can be considered a state actor, courts in the Ninth Circuit apply the two-step framework developed in *Lugar. O'Handley*, 62 F.4th at 1156. First, the court must determine "whether the alleged constitutional violation was caused by the 'exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'" *O'Handley*, 62 F.4th at 1156 (quoting *Lugar*, 457 U.S. at 937)). In other words, "the deprivation must result from a governmental

---

[4]   The Court takes judicial notice of the Poverello Center's Incorporation Status and 2025 Annual Report, which are publicly available on the Secretary of State's website at biz.sosmt.gov/search/business (last visited July 9, 2026).

[5] The Court takes judicial notice of Black Knight's 2025 Annual Report and its status as a limited liability company, which are publicly available on the Secretary of State's website at biz.sosmt.gov/search/business (last visited July 9, 2026).

policy." *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835 (9th Cir. 1999).

Second, if the governmental policy requirement is met, the court then asks "whether 'the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'" *O'Handley*, 62 F.4th at 1156 (quoting *Lugar*, 457 U.S. at 937). To be considered a state actor, a private entity must satisfy at least one of four tests: "(1) the public function test, (2) the state compulsion test, (3) the nexus test [or] (4) the joint action test." *O'Handley,* 62 F.4th at 1157. "These tests are interrelated, and they are designed to answer the same key question: whether the conduct of a private actor is fairly attributable to the State." *Ochoa v. Public Consulting Group, Inc.*, 48 F.4th 1102, 1109 (9th Cir. 2022). McKenzie's claims fail at both steps of the *Lugar* analysis.

### 1.    Governmental Policy Requirement

At the first step, with respect to the governmental policy requirement, McKenzie has not alleged facts showing that the Poverello Defendants were exercising a state-created right or enforcing a state-imposed rule when they enacted the no firearms policy, searched McKenzie's locker and bed area, and excluded him from the Shelter. McKenzie also fails to allege that Black Knight was exercising a state-created right or enforcing a state-imposed rule when it allegedly

enforced the Poverello Center's no firearms policy by searching McKenzie's locker and issuing a notice excluding him from the Shelter.

As addressed above, McKenzie does not identify any Missoula County policy that could have been the moving force behind the alleged constitutional violations. As to the City of Missoula, McKenzie alleges only broadly that: (1) the Poverello Center "enforces a categorical 'no firearms' policy [and] the City uses Black Knight…to enforce it"; (2) the Poverello Center and "City Council jointly draft and enforce rules"; (3) the City's "contract, board directives, and Mayor's ratification evidence adoption"; and (4) the "City conditions funding on compliance with unconstitutional policies." (Doc. 2 at 1, 3, 5). These generalized allegations are insufficient to plausibly allege that the Poverello Defendants and Black Knight were exercising a state-created right or acting pursuant to a state-imposed rule when they engaged in the challenged activity. Rather, as explained by the Poverello Defendants, they "derive their right to take the alleged actions from their own internal policies, procedures, and agreements with residents, not from a right conferred by the state or local government." (Doc. 34 at 5-6). Because McKenzie has not plead facts demonstrating that the actions of the Poverello Defendants and Black Knight are traceable to a state-created right or privilege or to a state-imposed rule of conduct, his claims against them do not satisfy the first step of the *Lugar* analysis.

18

Even if McKenzie's claims did satisfy the first step of the *Lugar* analysis, his claims fail at the second step because he has not alleged facts demonstrating that the Poverello Defendants and Black Knight can be considered state actors under the public function, state compulsion, nexus, or joint action tests.

### 2.    Public Function Test

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (quoting *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002)). It is well-settled "[t]hat a private entity perform[ing] a function which serves the public does not make its acts state action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837-38 (1982). Rather, the question is whether the private actor was performing a function that has been "traditionally the *exclusive* prerogative of the State." *Rendell-Baker,* 457 U.S. at 842 (italics in original). The Supreme Court has stressed that "very few" functions fall into this category. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 810 (2019).

### a.    *Poverello Defendants*

With respect to the Poverello Defendants, McKenzie's reliance on the public function test is based on a single allegation in the Complaint—that "[s]helter services are traditional government functions." (Doc. 2 at 5). This allegation is

19

accompanied by a citation to *Probst v. Central Ohio Youth Ctr.*, 511 F.Supp.2d

862 (S.D. Ohio 2007), which held that providing mental health care in prisons is an

obligation of the state, and private entities providing those services are state actors.

*Probst* is of little instructive value here. Unlike health care services provided in the

prison context, the shelter services provided by the Poverello Center are not

obligatory services that the state is required to provide. And unlike the prison

context, residents of the Shelter are not committed or incarcerated against their will

but rather reside at the Shelter voluntarily.

McKenzie cites *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006)

for the proposition that where a municipality has an obligation to provide shelter,

particularly where its policies criminalize homelessness when shelter is

unavailable, the entity tasked with providing that shelter performs a public

function. (Doc. 44 at 3). *Jones* addressed whether the enforcement of a city

ordinance that criminalized sitting, lying, or sleeping on the public streets and

sidewalks violated the Eighth Amendment right to be free from cruel and unusual

punishment when applied to homeless individuals for whom alternative shelter was

unavailable. The Ninth Circuit concluded that "the Eighth Amendment prohibits

the City from punishing involuntary sitting, lying or sleeping on public sidewalks

that is an unavoidable consequence of being human and homeless in the City of

Los Angeles." *Jones*, 444 F.3d at 1138, *vacated by settlement,* 505 F.3d 1006 (9th

20

Cir. 2007). *Jones* did not address whether the homeless shelter services offered by the Poverello Defendants are an exclusive government function and is therefore inapplicable here.

Although the Ninth Circuit has not directly addressed whether operating homeless shelter is a public function, the Seventh Circuit has held that operating a homeless shelter is not a public function for purposes of § 1983. *Smith v. United Caring Servs.*, 2025 WL 1672866, at *2 (7th Cir. 2025). "Although operating [homeless] shelters is a critical public service, it is not a function performed *exclusively* by the state." *Smith*, 2025 WL 1672866, at *2 (italics in original ) (citing *Rendell-Baker*, 457 U.S. at 842). Rather, operating a homeless shelter resembles operating "a nursing home or special education facility—caretaking functions that the Supreme Court has held are not exclusive to the government." *Smith,* 2025 WL 1672866, at *2; *see also Jean v. HRA*, 2024 WL 5090527, at *3 (S.D.N.Y. Dec. 11, 2024) ("Homeless shelters, in providing housing, also do not function as state actors"). The Court finds this reasoning persuasive and, consistent with *Smith*, concludes that operating a homeless shelter is not a public function for purposes of § 1983.

In a separate filing, McKenzie asks the Court to take judicial notice of an unsigned Professional Services Agreement between the City and the Poverello Center for provision of shelter services. (Docs. 59; 59-1 at 10-18). Because the

agreement is unexecuted, it is of no legal effect and does not establish the obligations of the parties. Even assuming the unexecuted agreement is subject to judicial notice, however, the fact that private entity is providing shelter services pursuant to a government contract does not make it a state actor. *See e.g. Ortega v. Samaritan Village Myrtle Ave. Men's Shelter*, 2020 WL 1043305, at *4 (E.D.N.Y. Mar. 4, 2020) ("[T]he provision of homeless services by a private organization, even under contract with the state or where subject to government regulation, does not turn the private organization or its employees into state actors.") (citation omitted).

Because operating a homeless shelter is not traditionally and exclusively a government function, McKenzie has not sufficiently pled that the Poverello Defendants can fairly be said to be state actors under the public function test.

> b.   *Black Knight*

With respect to Black Knight, McKenzie argues that Black Knight qualifies as a state actor under the public function test because it provides security services at the Shelter. (Doc. 75 at 4). The actions of private security guards generally do not constitute state action under § 1983. *See King v. Ashley*, 2014 WL 3689582, at *2 (E.D. Cal. July 23, 2014). "Where private security guards are endowed by law with plenary police powers such that they are de facto police officers," however, "they may qualify as state actors under the public function test." *Rabieh v.*

*Paragon Sys.*, 316 F.Supp.3d 1106, 1111 (N.D. Cal. 2018) (quoting *Romanski v.*

*Detroit Entm't, LLC*, 428 F.3d 629, 637 (6th Cir. 2005)).

McKenzie has not adequately alleged that Black Knight security guards

were performing a public function. The Complaint does not allege that Black

Knight's security guards were endowed with the type of plenary police power that

is traditionally and exclusively governmental or make any specific allegations at all

regarding the scope of their authority. *See Rabieh*, 316 F.Supp. at 1111 (granting

motion to dismiss complaint alleging that employees of private contractor

responsible for providing security services at a government building were state

actors under the public function test where the complaint failed to allege the

employees "were endowed with the type of plenary police power that is

traditionally and exclusively governmental," made "almost no allegations

regarding the scope of their power at all," and "[a]t most…suggest[ed] that the

security guards had some power to detain a person on the premises, temporarily

confiscate personal property…, and place a person in handcuffs" as "this small

collection of abilities, by itself, is not exclusively governmental and, as such, in

insufficient under the public function test."). At most, the Complaint can be

liberally read as alleging that Black Knight security guards had some limited

authority to conduct searches and to exclude shelter residents. (Doc. 2 at 3). Such

allegations fall short of plausibly demonstrating that Black Knight employees were

23

endowed with the type of plenary police power that is traditionally and exclusively governmental.

In a separate filing, McKenzie asks the Court to take judicial notice of an unsigned draft of a Professional Service Agreement between the City and Black Knight as an independent contractor for the provision of security services at the Shelter. (Doc. 59; 59-1 at 1-8). Because the agreement is unexecuted, it is of no legal effect and does not establish the obligations of the parties. Even assuming the unexecuted agreement is subject to judicial notice, however, the mere fact that a private security company is operating pursuant to a government contract does not make it a state actor. *See Capogrosso v. Gelbstein*, 2022 WL 4550812, at *2 (E.D.N.Y. Sept. 29, 2022) (citing *Kach v. Hose*, 589 F.3d 626, 648 (3d Cir. 2009) and *Rabieh*, 316 F.Supp.3d at 1106, 1111)).

To the extent McKenzie argues Black Knight performs a public function because it receives government funding (Doc. 75 at 4), the fact that an entity receives government funds does not transform private action into state action. *See e.g. Heineke v. Santa Clara University*, 965 F.3d 1009, 1012-14 (9th Cir. 2020) (the fact that private university received government federal and state funds that were conditioned on compliance with federal and state antidiscrimination laws and might lose government funds if it failed to comply with those laws did not convert the private university into a state actor).

24

The cases McKenzie relies on to support his public function argument are distinguishable. For example, McKenzie cites *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955-57 (9th Cir. 2008) to argue that the security services provided by Black Knight were a traditional state function. (Doc. 37 at 2). *Villegas* recognized the principle that a private entity performing a power "traditionally and exclusively reserved to the State" may be considered a state actor but held that a private non-profit corporation holding a festival on public property with city police officers providing security was not performing a traditional state function. *Villegas*, 541 at 955-57. McKenzie also cites *United States v. Day*, 591 F.3d 679 (4th Cir. 2010) for the proposition that private security guards performing police type functions under a municipal contract are state actors. (Doc. 37 at 2). However, *Day* held that armed private security guards were not state actors in part because they did not have the full panoply of powers afforded to law enforcement officers, such as plenary arrest authority. *Day*, 591 F.3d at 688-89.

Because McKenzie fails to plausibly allege that Black Knight employees are "endowed with the type of plenary police power that is traditionally and exclusively governmental," he has not sufficiently pled that Black Knight and its employees are state actors under the public function test. *Rabieh*, 316 F.Supp.3d at 1111.

3.    State Compulsion Test

25

Under the governmental coercion or compulsion test, the court "considers whether the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action." *Kirtley*, 326 F.3d at 1094 (citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836-37 (9th Cir. 1999)).

a. *Poverello Defendants*

McKenzie alleges that the City of Missoula "conditions funding on compliance with unconstitutional policies" and "ratifies [the] shelter's security practices by funding and acceptance." (Doc. 2 at 5-6). McKenzie's conclusory allegations that the City conditions funding on unconstitutional policies and ratifies the Poverello Defendants' security policies by providing funding are not sufficient to establish that the government coerced or significantly encouraged the Poverello Defendants to institute and enforce the no firearms policy or to engage in any of the actions that McKenzie asserts violated his constitutional rights. *See e.g. Rendell-Baker*, 457 U.S. at 841 (mere regulation, even regulation that is "extensive and detailed" does not convert a private entity's actions not state action); *Smith*, 2025 WL 1672866 at *2 (That homeless "shelters might receive state funds—even a significant amount—or are regulated by the state does not render them state actors" where the plaintiff "does not allege that the funding and regulation compelled or…encouraged the challenged actions."); *Heineke*, 965 F.3d at 1012-

26

14. Accordingly, McKenzie has not sufficiently pled that the Poverello Defendants are state actors under the government compulsion test.

      b.     *Black Knight*

McKenzie does not make any allegations in his Complaint that the City somehow coerced or significantly encouraged Black Knight to engage in the any of the actions that he claims violated his constitutional rights. McKenzie therefore fails to plead to that Black Knight can be considered a state actor under the government compulsion test,

      4.     Nexus and Joint Action Tests

Because the government nexus and joint action tests are similar, the Ninth Circuit has sometimes addressed the two tests together. *See e.g. Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000). The Court will do the same here.

Under the nexus test, the court asks whether "there is such a close nexus between the State and challenged action that the seemingly private behavior may be fairly treated as that of the State itself." *Kirtley*, 326 F.3d at 1095 (quoting *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001)). The Ninth Circuit has identified various factors for courts to consider when making this determination such as whether the organization is primarily made up of state institutions, whether state officials dominate the organization's decision making, whether state institutions largely generate the organization's

funds, and whether the organization is acting in place of a traditional state actor. *Villegas,* 541 F.3d at 955. Although state funding is one relevant factor, government funding alone is insufficient to make a private entity a state actor. *See e.g. Blum v. Yarertsky*, 457 U.S. 991, 1010-11 (1982) (concluding that state subsidization of nursing home operating costs and payment of the medical expenses of more than 90% of the patients in the facilities did not make the nursing homes state actors); *Polk v. Dodson*, 454 U.S. 312, 318 (1981) (concluding that a public defender paid by the state was not a state actor); *Kirtley*, 326 F.3d at 1095) (concluding that a guardian ad litem paid by the state, appointed by a state actor, and subject to regulation by state law was not a state actor).

Under the joint action test, the court considers whether "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley*, 326 F.3d at 1093 (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)). "This test is intentionally demanding and requires a high degree of cooperation between private parties and state officials to rise to the level of state action." *O'Handley*, 62 F.4th at 1159-60.

a.      *Poverello Defendants*

In an attempt to satisfy these tests as to the Poverello Defendants, McKenzie alleges that the "Shelter and City Council jointly draft and enforce rules." (Doc. 2 at 5). This bare and conclusory allegation is not sufficient to plausibly plead state action by the Poverello Defendants under the nexus and joint action tests. First, as to the nexus test, McKenzie does not allege that the Poverello Center is made up of City officials, that City officials control or dominate the Poverello Defendants' decision making or that the City largely generates the Poverello Center's funds. Additionally, as addressed above, the Poverello Defendants are not taking the exclusively traditional place of the City by operating a homeless shelter.

McKenzie's factual allegations are also insufficient to meet the joint action test. Even taking his allegations as true, the facts do not demonstrate a position of interdependence between the Poverello Defendants and the City with respect to the alleged actions giving rise to McKenzie's claims. McKenzie does not allege facts suggesting that the City has delegated any authority to the Poverello Defendants or given them any power normally reserved to the state, or that the City has accepted any benefits derived from the alleged unconstitutional behavior.

Likewise, there are no specific factual allegations contained in the Complaint to plausibly suggest the City coordinates with the Poverello Defendants to enforce the Shelter's no firearms policy. McKenzie argues the fact that the Poverello Defendants may call City police for assistance when residents do not

29

comply with Shelter's safety and security policies is evidence of the requisite nexus or joint action. (Doc. 44 at 4). To the extent the Complaint can be liberally read as asserting there is a sufficient nexus or joint action here because a City police officer responded to the Shelter and allegedly "interrogated [McKenzie] without reasonable suspicion" and "accus[ed]ed him of bringing a gun" to the Shelter. (Doc. 2 at 4), the fact that a private entity may request police assistance to enforce its rules does not make the entity a state actor. *See e.g. Smith*, 2025 WL 1672866 at *2 (finding that "calling the police, even frequently, to remove residents who violate rules does not make [a private homeless shelter] a state actor absent allegations of a common scheme to violate constitutional rights").

McKenzie cites *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747-48 (9th Cir. 2020) for the proposition that a contractual mandate to enforce a private entity's rule on public land creates the requisite government nexus. (Doc. 37 at 2). However, *Rawson* did not make such a clear holding. Rather, *Rawson* held a private corporation that subjected the plaintiff to involuntary mental confinement could be considered a state actor under the government nexus test based on several factors, including state statutes allowing the involuntary confinement, reliance on the state's police powers, extensive involvement by the county prosecutor in the commitment process, and leasing of the premises from the state. *Rawson*, 975 F.3d at 757. Only one of these factors—the leasing of public land—is present here, and

30

this factor alone is not sufficient to create a nexus between the Poverello Defendants and the City. *See e.g. National Broadcasting Co., Inc. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1025-26 (11th Cir. 1988) (the existence of a lease, alone, is insufficient to establish state action). Accordingly, McKenzie has not sufficiently pled that the Poverello Defendants are state actors under the nexus and joint action tests.

b.     <em>Black Knight</em>

In an attempt to satisfy these tests as to Black Knight, McKenzie alleges that "the City uses Black Knight [security] guards to enforce" the Shelter's no firearms policy. (Doc. 2 at 3). This conclusory allegation is not sufficient to plausibly plead state action by Black Knight. As to the nexus test, McKenzie does not allege that Black Knight is made up of City officials, that City officials dominate or control Black Knight's decision making, or that the City largely generates Black Knight's funds. Additionally, as addressed above, McKenzie does not allege facts demonstrating that Black Knight has plenary police power and is thus acting in place of the City by providing security services at the Shelter.

McKenzie similarly fails to allege any joint action between Black Knight and the City. He does not allege facts from which it could plausibly be inferred that the City was a joint participant in the alleged conduct giving rise to McKenzie's claims. McKenzie argues "[t]he alleged presence of and involvement of a Missoula

City Police officer in the events giving rise to this suit is a powerful factual allegation of joint participation." (Doc. 75 at 5). But taking the factual allegations in the Complaint as true, the City police officer was not present during the search of McKenzie's locker and was not involved in the decision to exclude him from the Shelter. McKenzie does not allege that any Black Knight employees were present when the City police officer arrived and questioned him about bringing a firearm into the Shelter.

McKenzie cites *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) in support of his joint action and government nexus theories. (Doc. 44 at 4). In *Tsao*, the Ninth Circuit held that a privately owned casino was a state actor because it had a "system of cooperation and interdependence" with the local police department. *Tsao*, 698 F.3d at 1140. The casino had a contractual arrangement with the police department giving casino security officers who participated in police department training the authority to issue citations for misdemeanor trespass, which had historically been a function solely reserved to the state. *Tsao*, 698 F.3d at 1128, 1140. There are no similar facts alleged here. McKenzie does not allege that Black Knight security guards have the authority to issue criminal citations or are trained by City police. To the contrary, the unexecuted Professional Services Agreement suggests that Black Knight would be responsible for obtaining training for its employees. (Doc. 59-1 at 6). Accordingly, even taking McKenzie's

32

factual allegations as true, the Complaint does not plausibly allege joint action between Black Knight and the City.

For all of the reasons stated above, the Court concludes that Mckenzie has failed to satisfy either step of the *Lugar* state actor analysis. Accordingly, McKenzie's claims that the Poverello Center's no firearms policy violates the Second Amendment (Count 1), that the search of his locker and bed area by Poverello Center and Black Knight employees violated the Fourth Amendment (Count 2), and that he was excluded from the Shelter in violation of his Fourteenth Amendment rights to procedural due process (Count 3) and equal protection (Count 5) fail to state a claim for relief.

Because McKenzie fails to adequately plead state action, the Court need not address the City's remaining arguments that Mckenzie also fails to plead sufficient facts showing that Poverello Center and Black Knight employees violated his rights under Fourth and Fourteenth Amendments. As discussed below, however, the Court will allow McKenzie to amend his Complaint to allege additional facts in support of state action. Accordingly, in the interest of judicial efficiency and streamlining the proceedings, the Court will address the City's remaining arguments.

**B.    Fourth Amendment**

33

Mckenzie's Complaint alleges two Fourth Amendment claims under § 1983: (1) an unlawful search of his locker and bed area by Black Knight and Poverello Center employees; and (2) an unlawful seizure by a City police officer, Officer Doe. The City argues the facts pled in the Complaint do not actually support Mckenzie's search or seizure claims and instead demonstrate that no Fourth Amendment violation occurred. The Court agrees.

### 1.    Poverello Center and Black Knight

Even if McKenzie had adequately pled the state action element of his claim against the Poverello Center and Black Knight—which he has not—the City argues he fails to state a claim for relief because his factual allegations show that he consented to the search of his locker and bed area. "Consent to search is a well-established exception to the Fourth Amendment's prohibition of warrantless searches[.]" *United States v. Enslin*, 327 F.3d 788, 793 (9th Cir. 2003). Whether consent to search was voluntarily given is "determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The Ninth Circuit has identified five factors to be considered in determining whether consent was voluntarily given, and not the product of duress or coercion: (1) whether the individual was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the individual was notified that he had a right not to consent; and (5) whether the individual was informed that

a search warrant could be obtained. *United States v Brown,* 563 F.3d 410, 415 (9th Cir. 2009); *see also United States v. Ramos-Gonzales*, 2025 WL 1696777, at *3 (D. Mont. June 17, 2025) (listing cases).

McKenzie's Complaint alleges that a Poverello Center employee (John Doe 1) and two Black Knight employees (John Does 2-3) demanded to search his locker. McKenzie objected and invoked his Fourth Amendment rights, and John Does 1-3 left without conducting a search. After John Does 1-3 left, McKenzie returned McCook's bag. McKenzie "then located John Doe Nos. 2-3 and, under duress, emptied his locker and bag and searched his bed area." (Doc. 2 at 3).

Taking these factual allegations as true, no Poverello Center employees participated in the search. McKenzie's factual allegations additionally reflect that he voluntarily consented to the search conducted by Black Knight employees. After Mckenzie invoked his Fourth Amendment rights and returned McCook's bag, he went and found John Does 2-3 and emptied his locker and bags for them. Although McKenzie claims he did so "under duress," this conclusory statement is not supported by the factual allegations, which reflect that McKenzie affirmatively sought out Johns Does 2-3 and emptied his locker and bags for them. (Doc. 2 at 3). McKenzie does not allege that he was in custody at the time of the search or that Does 2-3 had weapons drawn. By his own telling, McKenzie clearly knew he had a right not to consent to a search given his prior successful Fourth Amendment

objection. Accordingly, taking the facts alleged by McKenzie as true, his consent to the search by Black Knight was voluntary and his Fourth Amendment claim fails as a matter of law.

### 2.    Officer Doe

McKenzie's Complaint alleges a Fourth Amendment unlawful seizure claim against the City of Missoula police officer, Officer Doe, who is indisputably a state actor. Assuming that McKenzie's interaction with Officer Doe invoked the Fourth Amendment and taking the facts alleged in the Complaint as true, the City argues he fails to state a claim for relief because the interaction was a legally permissible investigative *Terry* stop. The Fourth Amendment protects individuals against unreasonable seizures. U.S. Const. amend. IV. There are two types of police seizures under the Fourth Amendment: investigative stops and full-scale arrests. *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995). Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police "officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable articulable suspicion that criminal activity is afoot." *Illinois v. Wardlaw*, 528 U.S. 119, 123 (2000). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (citing *Terry,* 392 U.S. at 21-22).

36

McKenzie alleges in the Complaint that as he was packing his belongings on the day in question, Officer Doe approached him, told him to keep his hands visible, "seized" his wrist, escorted him to his bed, and questioned him about bringing a gun to the Shelter. (Doc. 2 at 4). McKenzie asserts he invoked his right to remain silent, acknowledges that Officer Doe did not conduct a pat-down search, and says he was "released" after asking if he was free to leave. (Doc. 2 at 4). Although McKenzie claims that Officer Doe did not have reasonable suspicion to conduct a *Terry* stop (Doc. 2 at 5), he refers in the Complaint to a "police report" indicating that "Jeff McCook informed the officer that the gun belonged to [McKenzie] and that [McKenzie] had shown Jeff the gun that morning." (Doc. 2 at 4). Although McKenzie disputes that the gun was his, the police report reflects that Officer Doe had reasonable suspicion to briefly detain McKenzie to inquire about the firearm. Accordingly, accepting the facts alleged in the Complaint as true, McKenzie fails to sufficiently plead a Fourth Amendment unlawful seizure claim.

### C.    Fourteenth Amendment

Mckenzie's Complaint alleges that Poverello Center and Black Knight employees excluded him from the Shelter in violation of his Fourteenth Amendment rights to procedural due process and equal protection. Even if McKenzie had adequately pled the state action element of these § 1983 claims—

which he has not—the City argues he has failed to plead sufficient facts to state a claim for relief.

### 1.    Procedural Due Process

To state a procedural due process claim, a plaintiff must allege facts showing: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003). Property interests are created by state law and may include "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

McKenzie fails to sufficiently plead that he was deprived of a constitutionally protected property interest. McKenzie does not support his conclusory allegation that he has a property interest in "Shelter residency" with any reference to Montana statutory or common law, and as the City points out, the cases he does cite to do not support his assertion.[6] *Washington Legal Clinic for the*

---

[6]  To the extent McKenzie alleged he had a protected property interest in the contents of his locker, he does not claim that he was deprived of any personal property.

*Homeless v. Barry,* 107 F.3d 32 (D.C. Cir. 1997) (holding "that eligible homeless families lack[ed] the 'legitimate claim of entitlement' necessary to create a constitutionally protected property right"); *Morillo v. City of New York*, 178 A.D.2d 7 (N.Y. App. Div. 1992) (procedure to determine if illegal squatters could be considered to rent the space they occupied did not create a substantive property right for the squatters); *see also Johari v. Faith Mission, Inc.*, 2005 WL 8162539, at *4 (S.D. Ohio Oct. 14, 2005) ("As a voluntary resident of a homeless shelter, Plaintiff did not have an interest sufficient to trigger procedural due process."). Because McKenzie fails to adequately plead that he was deprived of a constitutionally protected property interest, his Fourteenth Amendment due process claim fails as a matter of law.

### 2. Equal Protection

The Fourteenth Amendment's equal protection clause "prohibits states from denying any person equal protection of the laws, with the general objective 'that all persons similarly situated should be treated alike.'" *Miller v. Winner*, 2024 WL 3835033, at *4 (D. Mont. Aug. 15, 2024) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To state a class-of-one equal protection claim, a plaintiff must allege facts showing: "(1) he has been intentionally treated differently than others similarly situated; and (2) no rational basis exists for the

difference in treatment." *Miller*, 2024 WL 3835033, at *4 (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)). "A class-of-one plaintiff also must show that the difference in treatment resulted from non-discretionary state action." *Miller*, 2024 WL 3835033, at *4 (citing *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 603 (2008)).

Here, McKenzie does not allege that other Shelter residents suspected of possessing a handgun were not excluded from the Shelter or allege any other facts showing that he has been treated differently from other similarly situated individuals. Even if he could point to a difference in treatment, he does not plead there was no rational basis for the difference, and he also fails to plead that any difference in treatment resulted from non-discretionary state action. Therefore, McKenzie fails to state an equal protection claim.

### D.    Municipal Liability

Even if any of McKenzie's federal constitutional claims could survive dismissal, the City argues McKenzie has not plead sufficient facts to demonstrate municipal liability. Relevant to his claim for municipal liability against the City, McKenzie alleges: "the City uses Black Knight…guards to enforce [the no firearms policy]," the "Shelter and City Council jointly draft and enforce rules," the City's "contract, board directives and Mayor's ratification evidence adoption," the "City conditions funding on compliance with unconstitutional policies," and

"Deliberate indifference: enforcing a blanket ban without process." (Doc. 2 at 1, 3, 5).

As argued by the City, these broad and conclusory allegations are merely consistent with liability and offer nothing more than a formulaic recitation of some elements of a claim for municipal liability without any supporting facts. McKenzie does not allege what specific City policy, custom, or practice, or ratification by City officials was a moving force behind the alleged constitutional violations and does not plead facts from which it could plausibly be inferred that "a municipal actor disregarded a known or obvious consequences of his action" as required to demonstrate deliberate indifference. *Brown*, 520 U.S. at 410.

### E.    Montana Constitutional Claims

In addition to his federal constitutional claims, McKenzie alleges violations of "corresponding provisions of the Montana Constitution," including Article II, §§ 4 (individual dignity), 10 (right to privacy), 11 (search and seizure), 12 (right to bear arms), 16 (administration of justice), 17 (due process of law), and 26 (trial by jury). (Doc. 2 at 1, 4-5).

"Like the United States Constitution, the Montana Constitution protects individual rights from *government* action, not *private* action." *Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743, 749 (9th Cir. 2003) (citing *State v. Long*, 700 P.2d 153, 157 (Mont. 1985) and several other Montana cases). With the exception

41

of his Fourth Amendment claim against Officer Doe, McKenzie has not pled state action implicating the United States Constitution. This means that Mckenzie has also failed to plead state action as required to implicate the Montana Constitution. *Single Moms*, 331 F.3d at 749 (holding that because the defendant's conduct was not "state action" implicating the United States Constitution, the defendant's conduct also was not "state action" implicating the Montana Constitution" and affirming the dismissal of the plaintiffs' Montana constitutional claims on that basis). Accordingly, with the exception of his Fourth Amendment claim against Officer Doe, McKenzie's Montana constitutional claims fail as a matter of law for failure to plead state action.

To the extent McKenzie alleges Officer Doe violated Montana's constitutional prohibition against unreasonable search and seizure, he fails to state a claim for the same reason that he fails to state a claim under the Fourth Amendment. As discussed above, taking the allegations in the Complaint as true, Officer Doe conducted a legally permissible investigative *Terry* stop. McKenzie fails to state a unlawful seizure claim under the Montana Constitution.

## V.    Missoula City Council and Mayor Andrea Davis's Motion to Dismiss

The City Council and Mayor Davis argue that McKenzie fails to state a claim for relief because McKenzie's claims against them are duplicative of his claims against the City. The Court agrees.

42

"A suit against a government officer in his official capacity is equivalent to a suit against the government entity itself." *Vondra v. City of Billings*, 2023 WL 197029, at *2 (D. Mont. Jan. 17, 2023) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). "An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Vondra*, 2023 WL 197029, at *2 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "Because 'local government units can be sued directly for damages and injunctive or declaratory relief' under *Monell*, '[t]here is no longer a need to bring official-capacity actions against local government officials.'" *Vondra*, 2023 WL 197029, at *2 (quoting *Graham*, 473 U.S. at 167 n.14). District courts in the Ninth Circuit, including in the District of Montana, have held that official capacity claims are duplicative of *Monell* claims against a local government entity and may be dismissed on that basis. *Vondra*, 2023 WL 197029, at *3 (citing several cases including *Saxon v. City of Dillon, Mont.*, 2020 WL 2732133, at *2 (D. Mont. May 26, 2020) and *Tuinstra v. Bonner County*, 2021 WL 2534983, at *4 (D. Idaho June 21, 2021)). Because McKenzie names Mayor Davis in her official capacity and the Missoula City Council is made up of government officers for the City, McKenzie's § 1983 claims against Mayor Davis and the City Council are therefore duplicative of his claims against the City and are subject to dismissal.[7]

---

[7] Having made this determination, the Court need not address the City Council and

## IV.    Motion for Leave to Amend

After the parties completed briefing on the Rule 12(b)(6) motions to dismiss, and in conjunction with his response to Black Knight's Rule 12(c) motion for judgment on the pleadings, McKenzie filed a motion for leave to amend his complaint to allege additional facts in support of the state action element of his § 1983 claims. (Doc. 73). As required by District of Montana Local Rule 15.1, McKenzie attached a copy of his proposed Amended Complaint to his motion. (Doc. 73-1).

A party may amend the complaint once as a matter of course within the time limits set out in Federal Rule of Civil Procedure 15(a)(1). Because those time limits have passed, McKenzie seeks leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2), which provides that a party may amend the complaint "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2).

In determining whether to grant leave to amend under Rule 15(a)(2), the court considers five factors: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint." *Pfau v. Mortenson*, 858 F.Supp.2d 1150, 1162

---

Mayor Davis's additional argument that they are entitled to legislative immunity.

(D. Mont. 2012) (quoting *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003)).

These factors are not given equal weight and "futility alone can justify the denial

of a motion for leave to amend." *Nunes*, 375 F.3d at 808; *see also Meyer v. United*

*Healthcare Ins. Co.*, 2023 WL 2899089, at *2 (D. Mont. Mar. 22, 2023) ("Futility

alone can justify denial of a motion for leave to amend, even if the party is pro

se.") (citations and internal quotation marks omitted). Futility is the only factor at

issue here.

The City, City Council, Mayor Davis, Poverello Defendants, and Black

Knight (collectively "Defendants") oppose McKenzie's motion on the sole ground

that the proposed amendment would be futile. (Docs. 76, 77, 79). They argue the

proposed Amended Complaint simply restates the original Complaint in different

terms, and because it could not withstand the already filed motions to dismiss, the

proposed amendment would be futile.

The "proper test to be applied when determining the legal sufficiency of a

proposed amendment is identical to the one used when considering the sufficiency

of a pleading challenged under Rule 12(b)(6)." *Nordyke v. King*, 644 F.776, 788

(9th Cir. 2011). A proposed "amendment is futile 'if it merely restates the same

facts as in the original complaint in different terms, reasserts a claim on which the

court previously ruled, fails to state a legal theory, or could not withstand a motion

to dismiss.'" *Meyer*, 2023 WL 2899089, at *2 (quoting 3 *Moore's Federal*

45

*Practice,* § 15.15[3] (Matthew Bender 3d Ed.)); *see also Abels v. JBC Legal Grp, PC*, 229 F.R.D. 152, 157 (N.D. Cal. 2005) (A proposed amendment is futile if "no set of facts can be proved under the amendment that would constitute a valid claim or defense.").

Although McKenzie's proposed Amended Complaint is reformatted and reworded in parts, it is substantially similar to, and essentially restates, his original Complaint. (Compare Doc. 2 with Doc. 73-1). McKenzie has, however, provided additional factual allegations in an attempt to plausibly plead state action. McKenzie explains that "[i]n anticipation of challenges to the sufficiency of the pleadings," he "diligently pursued public records request to obtain the controlling Professional Services Agreements and related financial records governing the relationship between the City of Missoula and the private Defendants." (Doc. 81 at 2). McKenzie states that "[t]hese documents, which were not available to [him] at the time of initial filing but were obtained prior to the filing of Defendants' motions, provide the specific factual predicate for his state action theory." (Doc. 81 at 2). McKenzie's additional factual allegations appear in Paragraph 33 of the proposed Amended Complaint, which reads as follows:

> 33. State Action Through Governmental Entwinement, Delegation and Policy. The actions of Poverello and Black Knight constitute state action because they are so entwined with municipal policy and authority that their conduct is fairly attributable to the state. The City of Missoula has, by official policy expressed through binding Professional Services Agreements and substantial public funding, created a joint enterprise wherein it has

delegated its municipal authority to these private entities, rendering them state actors.

a. Symbiotic Relationship and Nexus: The City and the private Defendants are inextricably linked through a symbiotic relationship. The Shelter is located on property owned by the City. In 2025, the City paid the Poverello Center over $1.2 million for shelter operations and paid Black Knight over $425,000 for security services at the Shelter. This extensive financial and operational integration establishes a sufficiently close nexus to treat the private Defendants as arms of the City.

b. Delegation of Public Function: The City's contract with Black Knight constitutes a delegation of the City's traditional policing power and security function within the Shelter. By accepting the delegation of the state's exclusive authority to provide security and enforce rules in a public facility, Black Knight was performing a public function and became a state actor.

c. Ratification Through Deliberate Indifference: By failing to act or correct a known pattern of constitutional violations and by continuing to fund and contract with Poverello and Black Knight, the City has demonstrated deliberate indifference and has ratified their unconstitutional policies and customs.

(Doc. 73-1 at 4).

Paragraph 33 adds to the original Complaint in that it refers to the City's "Professional Services Agreements" with the Poverello Center and Black Knight, and publicly available financial records indicating that the Poverello Center and Black Knight receive funding from the City. (Doc. 73-1 at 4). Paragraph 33 also adds general allegations that the City acted with deliberate indifference by ratifying "unconstitutional policies and customs." (Doc. 73-1 at 4).

Although McKenzie does not refer to the Professional Services Agreements in the original Complaint, they are the subject of an impermissible sur-reply he

47

filed in opposition to the Poverello Defendants' motion to dismiss[8] and the request

for judicial notice addressed briefly above. (Docs. 55; 59). McKenzie submitted an

unsigned draft of a Professional Services Agreement between the City and

Poverello Center (Doc. 59-1 at 10-18) as an attachment to his sur-reply and asks

the Court to take judicial notice of the document. (Doc. 59). McKenzie also

submitted an unexecuted Professional Services Agreement between the City and

Black Knight. (Doc. 59-1 at 1-9). Although McKenzie describes these unexecuted

agreements as "official contracts" (Doc. 59 at 1), the documents are not signed by

either party and it is not clear from the record whether the authenticity of the

documents is in dispute. Because they are unexecuted, the Professional Services

Agreements do not establish the terms of the legal relationship between the City

and the Poverello Defendants and Black Knight.

Given the alleged existence of executed legally binding Professional

Services Agreements, however, the Court cannot say as matter of law that the

proposed amendment would be futile. The terms of operative agreements are

potentially relevant and material to both steps of the *Lugar* analysis.

---

[8] McKenzie filed a sur-reply in opposition to the Poverello Defendants' motion to dismiss (Doc. 55) without seeking leave of Court as required by District of Montana Local Rule 7.1(d)(1). Because McKenzie did not seek leave of Court, his sur-reply is improper.

At the first step, the Court must determine whether the alleged constitutional violations were caused by the exercise of a right or privilege created by the state or by a rule of conduct imposed by the state. *O'Handley*, 62 F.4th at 1156. If the operative Professional Services Agreements with the City required the Poverello Center to adopt a no firearms policy and required Black Knight to enforce it, those agreements could provide the requisite link between the alleged Second Amendment constitutional violations and a state-created right or rule.

The terms of the operative Professional Services Agreements could also materially affect the step-two analysis. If, for example, the City's agreement with the Poverello Center shows that in addition to providing significant funding, City officials control the Poverello Center's decision making with respect to shelter policies and enforcement procedures, the terms of the agreement could materially affect whether the Poverello Defendants can fairly be considered state actors under the nexus test. Likewise, if the City's agreement with Black Knight shows that in addition to providing significant funding, the City has granted it plenary police powers such that its security guards are de facto police officers, the terms of the agreement could materially affect whether Black Knight can fairly be considered a state actor under the public function test. The operative Professional Services Agreements are thus central to Mckenzie's state action theory and could likely be considered on a Rule 12 motion to dismiss or for judgment on the pleadings

Because the operative Professional Services Agreements are not part of the record, however, the Court cannot say that permitting McKenzie to amend his Complaint to allege the existence of valid Professional Services Agreements would necessarily be futile.

## V.    Remaining Motions

On May 15, 2026, after the motions addressed above were fully briefed, McKenzie made several additional filings: (1) Supplemental Brief in Opposition to Defendants' Motion for Dismiss and Motion for Judgment on the Pleadings and in Further Support of Motion for Leave to File Amended Complaint (Doc. 83); (2) Notice of Errata (Doc. 84) and Updated Exhibits of Controlling Constitutional Authorities (Doc. 84-1); (3) Memorandum of Law In Opposition to Defendants' Motions to Dismiss and Motion for Judgment on the Pleadings (Doc. 85) and additional notices and exhibits (Docs. 85-1 to 85-3); and (4) Omnibus Notice of Filing Supplemental Evidence and Authorities Municipal Enforcement Framework (Doc. 86).

The City Defendants have moved to strike McKenzie's additional filings on the grounds that they are not permitted by the Local Rules and interfere with judicial economy (Doc. 87). The Poverello Defendants and Black Knight join in the motion. (Doc. 89, 90). McKenzie's additional filings violate Local Rule 7.1(d)(D), which provides that after the moving party files a reply "[n]o further

briefing is permitted without prior leave" of Court and Local Rule 7.4 governing the submission of additional authority after briefs have been filed. McKenzie's additional filings also interfere with judicial economy, substantially burden the Defendants and the Court, and greatly confuse the record. The motion to strike McKenzie's impermissible filings is well taken. The Court has nevertheless reviewed McKenzie's filings and determined that they would not change the outcome here.

In addition to the motions addressed above, McKenzie has filed a motion to strike Black Knight's affirmative defenses (Doc. 54) and a motion for partial summary judgment (Doc. 56). Because the Complaint fails to state a claim for relief, McKenzie's motion to strike Black Knight's affirmative defenses and for summary judgment are moot. The motions are also premature and procedurally improper at this stage in the proceedings.

## IV.    Conclusion

In summary, the Court concludes for the reasons stated above that the Complaint fails to state a claim against the County Defendants, and fails to plausibly plead that the Poverello Defendants and Black Knight engaged in state action as required to state a claim under § 1983 for violations of the Second, Fourth and Fourteenth Amendments of the United States Constitution or to state claim under the Montana Constitution.

Even if the Complaint did plausibly allege state action, McKenzie (1) fails to plead sufficient facts that any Fourth Amendment violation occurred; (2) fails to sufficiently plead that he was deprived of a constitutionally protected property interest under the Fourteenth Amendment; and (3) fails to sufficiently plead a class-of-one equal protection claim under the Fourteenth Amendment. McKenzie also fails to plead sufficient facts to establish municipal liability against the City under § 1983, and his concomitant Montana constitutional claims fail as a matter of law for the same reasons that his Fourth and Fourteenth Amendment claims fail.

The proposed Amended Complaint would not cure the pleading deficiencies as to McKenzie's Fourth and Fourteenth Amendment claims. These claims will therefore be dismissed without leave to amend. The proposed Amended Complaint also would not cure the pleading deficiencies as to the County Defendants and the City Council and Mayor Davis. Accordingly, McKenzie's claims against these defendants will also be dismissed without leave amend.[9]

As explained above, however, the Court will grant McKenzie leave to file an Amended Complaint to incorporate Paragraph 33 and allege the existence of valid Professional Services Agreements, which are central to McKenzie's state action

---

[9] To the extent McKenzie names Jill Bonny in her individual capacity, he does not allege facts showing that she individually participated in any alleged constitutional violations as required to state a claim under § 1983. McKenzie's individual capacity claims against Bonny are dismissed without leave to amend.

52

theory and his sole potentially viable constitutional claim—that the City, the Poverello Defendants, and Black Knight violated his rights under the Second Amendment to the United States Constitution by enacting and enforcing a no firearms policy at the Shelter.

Accordingly, IT IS ORDERED that:

(1) The Rule 12(b)(6) motions to dismiss the original Complaint filed by the County Defendants (Doc. 10), the City of Missoula (Doc. 17), the Missoula City Council and Mayor Davis (Doc. 19), and the Poverello Defendants (Doc. 33) are GRANTED.

(2) Black Knight's Rule 12(c) motion for judgment on the pleadings (Doc. 71) is GRANTED.

(3) The City Defendants' Motion to Strike (Doc. 87) is GRANTED.

(4) McKenzie's motion to strike Black Knight's affirmative defenses (Doc. 54) and motion for partial summary judgment (Doc. 56) are DENIED.

(5) McKenzie's motion for leave to file an Amended Complaint (Doc. 73) is GRANTED subject to the limitations outlined above. McKenzie shall have until August 10, 2026, to file an Amended Complaint alleging Second Amendment claims against Black Knight, and the Poverello Defendants and a municipal liability claim against the City of Missoula. Defendants shall have 21 days from the date the Amended Complaint is filed to answer or file Rule 12 motions. The

Court notes that because any operative Professional Service Agreements are central to McKenzie's few remaining claims under § 1983, authenticated versions of agreements can likely be considered on any forthcoming Rule 12 motions.

McKenzie is cautioned if he fails to file an Amended Complaint on or before August 10, 2026, this case will be dismissed. McKenzie is further cautioned that he must comply with the Local Rules for the District of Montana, including the briefing limitations set forth in Rule 7.1(d).

DATED this 13th day of July, 2026.

_____
Kathleen L. DeSoto
United States Magistrate Judge